UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JAMES T. MARR, JR.                                                                    PLAINTIFF

v.                                                              CIVIL ACTION NO. 3:06-CV-20-S

COMMONWEALTH LAND TITLE INSURANCE COMPANY                         DEFENDANT

## <u>MEMORANDUM OPINION</u>

This matter is back before this Court following the Court of Appeals's reversal of our grant

of summary judgment in favor of defendant Commonwealth Land Title Insurance Company.

Commonwealth has renewed its motion, which we again sustain.

## I.

In July 1980, Norman Culbertson acquired title to a home in Louisville, Kentucky. In 1991,

various creditors[1] began bringing legal actions against him. Culbertson sought to protect his home

from any judgment by entering into a sale-leaseback arrangement with his business partner Layne

Smith. In 1994, Culbertson conveyed title to the home to Smith, who satisfied all existing liens on

the property. Culbertson continued living in the home in exchange for making periodic interest

payments to Smith, and also retained an option to repurchase the home from Smith.

In 1995, Culbertson's creditors obtained and recorded judgment liens against him.

Culbertson filed for Chapter 7 bankruptcy protection in 1996 and was discharged a year later, but

the judgment liens remained as a cloud on the title to the property.

Culbertson subsequently approached James Marr for a loan to finance a business venture,

offering the home as collateral. Marr agreed, but learned that Culbertson had conveyed ownership

---

[1] National City Bank, The Columbia Club, and Thomas E. Grote. The Commonwealth of
Kentucky also eventually filed a tax lien against Culbertson.

of the property to Smith. In order to secure the loan, therefore, Marr had Culbertson assign to him the right to repurchase the property, which he exercised to buy the home from Smith. Marr and Culbertson then executed a "contract for deed," which conveyed equitable title to Culbertson and allowed him to remain on the land in exchange for installment payments toward the title and repayment of Marr's loan to him. In total, Marr committed about $260,000 to these transactions: $200,000 to purchase the home (financed by a mortgage loan from Bedford Bank) and $60,000 of his own money for Culbertson's business venture.

Marr and Bedford Bank each purchased title insurance from Commonwealth in order to protect their respective interests in the property. Commonwealth was evidently aware of the judgment liens against Culbertson, but issued the policies anyway without explicitly excluding those potential defects from its coverage.

Culbertson eventually defaulted on Marr's loan, and in 2003 Marr filed a foreclosure action in Jefferson Circuit Court to extinguish Culbertson's interest in the property. In addition to Culbertson, the foreclosure suit named Bedford Bank and Culbertson's preexisting creditors as defendants. Of those creditors, only Grote initially filed an Answer,[2] which asserted that he held a valid lien on the property and that his lien took priority over Marr's interest. As Marr's title insurer, Commonwealth initially provided counsel during these proceedings.

The Circuit Court referred the case to a "Master Commissioner," who held four hearings and accepted briefing before issuing a detailed Report. This Report concluded that the agreement between Smith and Culbertson was a "refinancing agreement and nothing more," and characterized Smith's putative ownership of the home as a "sham" designed to shield the property from

---

[2] The others eventually joined in the litigation.

-2-

Culbertson's creditors. The Master Commissioner therefore decided that the arrangement must be treated as a mortgage.

Three consequences followed from this conclusion. First, because Culbertson had never actually given up ownership of the home, his creditors' judgment liens validly attached to the property despite the fact that they were entered after he had supposedly sold it. Second, because Smith's interest in the home was a mortgage rather than fee simple ownership, Marr could not have bought from him anything more than a mortgage interest. Third, because Marr acquired this mortgage interest after the liens had been filed, the liens held priority.

To this last conclusion, Marr objected that he had bought the home in good faith and that he was therefore entitled to protection as a bona fide purchaser for value. The Commissioner rejected this argument. The Report instead ruled that Marr was Culbertson's business partner and had knowledge of Culbertson's "financial and legal entanglements." Marr was therefore sufficiently "on notice" of other possible liens on the property that he did not qualify as a bona fide purchaser. In contrast (and over Grote's objections), the Commissioner decided that Bedford Bank was wholly unaware of the nature of the transactions between Culbertson, Smith, and Marr, and was therefore protected as a bona fide purchaser. As a result, the Report held that Bedford Bank's interest was superior to all others, despite the fact that the creditors' liens were prior in time and had been reported to the bank in a letter from Commonwealth regarding the title insurance policy.

The Report thus resulted in the following arrangement: Culbertson held legal title to his home, subject to (in order of priority): Bedford Bank's mortgage; the preexisting creditors' liens; and finally Marr's mortgage interest. Marr thus unexpectedly found himself on the bottom of the pile, forced to defend himself against Culbertson's creditors' liens.

Following the Report, Commonwealth ceased paying for Marr's efforts to defend his title. It argued that the defect in Marr's title—the several creditors with claims superior to his—arose because of his own failure to act in good faith in order to qualify as a bona fide purchase or to otherwise protect himself. On Commonwealth's view, the Report's finding that Marr was at fault relieved it of any duty to defend or indemnify him. Marr filed objections to the Report with the Circuit Court, which were overruled when the court adopted the Report in full. Marr filed a motion to reconsider this decision, but before it was decided he settled with Culbertson's creditors for a total of $80,000. Commonwealth refused to cover these losses under Marr's title insurance policy.

Marr then brought this suit against Commonwealth in state court, seeking to recover his losses and attorney's fees in defending the foreclosure action and alleging bad faith in Commonwealth's failure to timely pay under the insurance contract. The case was removed to this Court, which granted summary judgment to Commonwealth on collateral estoppel grounds. That decision was reversed, and the case remanded, by the Court of Appeals on January 29, 2009. Commonwealth has again moved for summary judgment.

## II.

A party moving for summary judgment has the burden of showing that there are no genuine issues of material fact and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). The dispute

must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.*  The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in the light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Sitting in diversity, the Court will apply Kentucky law to resolve the questions at hand. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008) *(citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

## III.

Commonwealth apparently concedes that the liens against which it was asked to defend are superficially within the policy's broad outlines. It defends itself on the ground that coverage for those liens was excluded by language elsewhere in the contract. Before examining Commonwealth's defense, we pause to consider more clearly the nature of Marr's affirmative case.

The controversy arose after Marr filed a foreclosure action against Culbertson. One of Culbertson's creditors, Tom Grote (who was named as a defendant), filed a counterclaim against Marr. This counterclaim did not assert anything regarding Marr's status as a bona fide purchaser. It simply asserted (as is true) that Grote's judgment lien against Culbertson had been filed before Marr took his mortgage interest (which he had thought to be an ownership interest), and that the judgment lien therefore held priority. Marr responded that he was a bona fide purchaser, to which

Grote replied that Marr had participated in a sham transaction and was not entitled to protected status.

Grote's claim was premised on the priority of his lien, and it was against this claim that Marr asked Commonwealth to provide a defense. We therefore primarily consider the nature of Grote's counterclaim against Marr, and whether the lien itself is such that it is excluded by the terms of the policy. Commonwealth has spilled quite a bit of ink arguing that Marr was not a bona fide purchaser for value, and that this conclusion necessarily resolves the case in its favor. That status, however, is relevant only to the extent that it proves one of Commonwealth's defenses to recovery under its insurance contract.

Commonwealth's contract binds it to insure Marr against losses caused by (*inter alia*) "[a]ny defect in or lien or encumbrance on the title." In addition, Commonwealth is required to "pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured." Failure either to pay a covered loss or to defend against a covered lawsuit would constitute a breach of the insurance contract, entitling Marr to damages. The law in Kentucky is that the contractual duty to defend is to be construed more broadly than the duty to indemnify: "[I]f there is any allegation in the complaint which potentially, possibly or might come within the coverages of the policy, then the insurance company has a duty to defend." *O'Bannon v. Aetna Casualty & Surety Co.*, 678 S.W.2d 390, 392 (Ky. 1984). "The insurance company must defend any suit in which the language of the complaint would bring it within the policy coverage regardless of the merit of the action." *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991) (*citing Wolford v. Wolford*, 662 S.W.2d 835 (Ky. 1984)).

Corollary to this principle is the rule that "[t]he determination of whether a defense is required must be made at the outset of the litigation." *Id.* (*citing Knapp v. Chevron USA, Inc.*, 781 F.2d 1123 (5th Cir. 1986)). And "[t]he duty to defend continues to the point of establishing that [the theory of] liability upon which plaintiff was relying was in fact not covered by the policy and not merely that it might not be." *Id.* (*citing* 7C Appelman, Insurance Law and Practice § 4683.01 at 69 (Berdal ed. 1979)). Furthermore, "an insurer which breaches its duty to defend and who is subsequently determined to owe a duty of indemnity must pay the judgment." *Id.* at 280; *Cincinnati Ins. Co. v. Vance*, 730 S.W.2d 521, 523 (Ky. 1987).

In this case, there is no dispute that Commonwealth ceased defending Marr against Grote's claims in December 2004, following the issuance of the Commissioner's Report. Litigation on Culbertsons' creditors' liens continued, with the Circuit Court entering a Final Judgment and Order of Sale on February 14, 2005 and an opinion adopting the Report on April 14, 2005. Marr moved to amend or vacate that opinion but ultimately settled the creditors' claims before the court rendered its decision.

## IV.

Marr has two separate claims under the insurance policy. First, seeks to recover attorney's fees from the date that Commonwealth pulled its coverage to the date that he settled the creditors' claims. To win on this theory he would have to show that, at the time Commonwealth ceased paying his lawyer, it had not yet been conclusively established that the creditors' claims were not covered by the policy. Second, if Marr can now show that the creditors' claims against him were in fact covered under the contract, he is entitled to indemnity for the $80,000 he paid to settle the case.

Commonwealth argues that  its contract with Marr bars coverage for defects for which the insured was responsible. Specifically, paragraph 3(a) of the contract's "Exclusions from Coverage" section precludes Commonwealth's liability for "[d]efects, liens, encumbrances, adverse claims or other matters . . . created, suffered, assumed or agreed to by the insured claimant."

Commonwealth's position appears to be limited to claims that Marr either "created" or "assumed" the defects in question in the underlying suit. But defendant's protests and case citations notwithstanding, there can be no serious argument that Marr "created" the liens against which he seeks defense. Those liens were created through the actions of Culbertson and his creditors, long before Marr entered the scene. The Sixth Circuit has stated that "[t]he term 'created' has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence or negligence." *American Sav. and Loan v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986).[3] Commonwealth argues that Marr created the problem through his involvement with Culbertson's attempt to shield his property from his creditors. But Marr's notice of other possible liens did not "create" a new problem with the title. Rather, they foreclosed a defense ("bona fide purchaser" status) to a preexisting cloud on the title. This is not the same thing as creating that cloud in the first instance.

Commonwealth is thus left to argue that Marr "assumed" the risk of a superior claim to his title. The Sixth Circuit has stated that "an insured does not assume an assessment against property 'merely because he agreed to take the property "subject to" any assessments.' 'Assume,' under this

---

[3] The Court of Appeals applied Tennessee law in *American Savings & Loan*, but noted that "[a]lthough no Tennessee cases construe the terms 'created, suffered, assumed or agreed to' in the context of title insurance exclusions, their meaning is fairly well established in other jurisdictions." 793 F.2d at 784. It therefore drew on those other jurisdictions in discerning the law. Because Kentucky courts also have not construed these terms, we follow the Sixth Circuit's lead.

-8-

definition requires knowledge of the specific title defect assumed." *Id.* (citations omitted). That is, "accepting" the risk of the possible existence of liens on a property is not a legal "assumption" of any particular lien without actual knowledge of the lien in question. So: Did Marr know, when he took his interest in the property and acquired title insurance, of the existence of the specific lien with which he had to contend? Did he also voluntarily undertake responsibility for that lien? If the answers to both of those questions is Yes, Commonwealth is not liable to indemnify Marr for the settlement money he doled out. If those questions had also been answered conclusively at the time it ceased funding Marr's defense, Commonwealth also did not breach its duty to defend him.

Commonwealth argues that collateral estoppel should decide the case. It claims that the state court conclusively decided various issues in this case, including whether Marr for legal purposes knew of the competing claims to the property he was buying (or, as it happened, mortgaging). The Master Commissioner and the Jefferson Circuit Court decided that Marr was not a bona fide purchaser because his knowledge of Culbertson's financial situation put him on inquiry notice that other prior creditors might have existed:

> Marr was apparently aware of Culbertson's need to shield his property from creditors and understood that the previous conveyance to the Smiths was only a means of refinancing Culbertson's debts. . . . Even if Plaintiff's knowledge of the facts was imperfect or incomplete, he was certainly aware that his "purchase" from the Smiths was not the arms length "sale" it purported to be. That alone is sufficient to place Marr on notice . . . that any interest he acquired in the property might be subject to other liens.

(Master Comm'r Report at 5.) This finding suggests some knowledge or notice of the potential for competing claims to the property. However, it does not by itself show specific knowledge of the precise title defects in question. Inquiry notice alone is not sufficient to establish assumption of an obligation. Further, the state court's finding does not show that Marr voluntarily assumed any title

defect. Whether he did so is a legal question involving the construction of the insurance contract, a task not undertaken by the state courts. Collateral estoppel is not a sufficient basis for the defense to prevail here.

The Court must therefore rely on the record before it in assessing whether Marr actually assumed the obligations as alleged. And in fact, Marr appears to have had *actual* knowledge of liens on the property. As the Court of Appeals pointed out (slip op. at 5), several weeks before the date of the policy, Commonwealth issued to Marr a "Commitment for Title Insurance" that recited the existence of various recorded liens on the property, and indicated that they needed to be paid and released before Commonwealth would issue the policy. As it happened, Marr took his interest in the property (and Commonwealth issued its policy) notwithstanding the fact that the liens had not been released. Although Marr professes not to have known that there were any liens adhering to the property, the fact that he had been informed, in writing, of their existence before the transaction went through gives the lie to that claim. We think that, as a matter of law, Marr had actual knowledge of the liens, and that he should have known that they attached to the land. After all, had they not, why would Commonwealth have insisted that they be paid before it would issue an insurance policy? Because he was aware of the specific liens, and because he bought the property and took out insurance anyway, we find that Marr assumed the risk that those liens would be superior to his, and that Commonwealth was therefore under no duty to indemnify him. Moreover, because both parties had the information necessary to reach this conclusion from the outset (indeed, they had it from the time the Commitment for Title Insurance was issued), Commonwealth was never under a duty to defend him: the claims Marr sought to raise were excluded from the policy from its inception. The Court will therefore grant summary judgment to Commonwealth.

The Court will enter a separate order in accordance with this opinion.


**Charles R. Simpson III, Judge**
**United States District Court**

December 18, 2009